281 So.2d 112 (1973)
Donald Louis PRINCE
v.
PARETTI PONTIAC COMPANY, INC.
No. 52674.
Supreme Court of Louisiana.
June 11, 1973.
Rehearing Denied August 20, 1973.
*113 Uddo & Gertler, M. H. Gertler, New Orleans, for plaintiff-applicant.
William J. Daly, Charles D. Lancaster, New Orleans, for defendant-respondent.
DIXON, Justice.
This is a redhibitory action. Plaintiff Donald L. Prince sued Paretti Pontiac Company, Inc. for the avoidance of the sale of an automobile. After a trial, the district court dismissed plaintiff's suit. The Court of Appeal for the Fourth Circuit affirmed the judgment of the trial court. 262 So.2d 826 (1972). We granted plaintiff's petition for a writ of certiorari. 262 La. 1087, 266 So.2d 219 (1972).
Prince bought a new 1970 Pontiac Lemans automobile from Paretti Pontiac on *114 or about July 2, 1970.[1] Delivery of the automobile was effected July 3, 1970. Within a few days of the sale, Prince began to notice certain imperfections in the automobile. His wife called the Paretti Pontiac salesman with whom they had dealt and notified him of their dissatisfaction. Evidently, the salesman assured them that Paretti Pontiac would remedy the imperfections if they would bring the automobile to the dealer's service department. The automobile was not brought to Paretti's for repair until July 21, 1970. During the intervening period defects in the automobile's transmission system manifested themselves.
When Prince arrived at Paretti Pontiac on July 21, 1970 with his recently purchased automobile, he was something less than a satisfied customer. An unpleasant confrontation immediately occurred between Prince and employees of the dealership. Prince was able, however, to deliver to both the owner and the general service manager of Paretti Pontiac a letter which stated his dissatisfaction with both the automobile and the dealership, and a list of the defects in his automobile.[2] Prince then left without giving Paretti an opportunity to repair the defects. He testified that he had become convinced that Paretti Pontiac was not interested in helping him.
Prince then wrote a letter and sent a telegram to the National Customer Relations Department of the Pontiac Motor Division of General Motors Corporation, complaining of the defects in his automobile and of his treatment by Paretti Pontiac. He also wrote similar letters to Customer Relations Managers of several of Pontiac's regional offices in various parts of the nation.
In response to these communications, a meeting was arranged between Prince and James B. Nichols, Area Parts and Service Manager of Pontiac Motor Division. On July 27, 1970, Nichols and Mr. and Mrs. Prince met at Paretti Pontiac. The problems were discussed and various assurances were made to Prince, but he refused to allow his automobile to be repaired at Paretti Pontiac. On August 6, 1970, another meeting between Nichols and the Princes occurred at Pattison Pontiac, another authorized Pontiac dealer in the New Orleans area. At this meeting, Nichols drove the automobile and otherwise inspected it for defects. Arrangements were made for the automobile to be brought back to Pattison Pontiac for repair work. However, Prince refused to allow the repair work to be performed. On November 17, 1970, Prince instituted this legal action.
The statutory basis of the action in redhibition is Civil Code art. 2520, which provides:
"Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient *115 and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice."[3]
Both lower courts found that plaintiff had failed to prove the existence of a redhibitory defect. We disagree.
The record shows that the transmission in plaintiff's new automobile began to malfunction several days after the sale. Mr. Ray Williams, a trained mechanic who was then employed as body shop manager for Royal Oldsmobile, inspected plaintiff's automobile on August 20, 1970. He testified that on that date he drove plaintiff's automobile and found that the automatic transmission would not shift from low gear and would not shift into reverse gear. Although Williams speculated that the problem could have been in the transmission linkage, he did not examine the transmission for the cause of the malfunction.
Mr. Carl Farris, a retired automobile mechanic, testified that he inspected the automobile twice during the summer of 1970. During the early summer, he drove the car and found the transmission to be irregular and unusually noisy. About a month or so later, he was called to the Princes' home where he found that, although the gears would engage, the automobile would not move forward or backward. Mr. Farris did not testify concerning the cause of the transmission malfunction.
Mr. Joseph McConnell, manager of a transmission shop in the New Orleans area, testified that he inspected the Princes' new automobile during the summer of 1970 and noticed that the automobile "had no reverse gear." He did not inspect the car for the cause of the transmission malfunction.
Finally, Mr. Nichols, the Area Service Manager for Pontiac, testified that when he drove the automobile on August 6, 1970, he found that the transmission shifted erratically.
There is no evidence in the record which contradicts this testimony. Therefore, we conclude that the plaintiff proved a defect in the transmission system of his new Pontiac automobile. We find that the transmission defect was "[a] vice or defect in the thing sold, which renders... its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." C.C. 2520.[4]
The defective transmission was not an "apparent defect" which the buyer could have discovered through simple inspection of the automobile. C.C. 2521. Neither did the salesman tell the plaintiff either before the sale or at the time of the sale that the automobile had a defective transmission. C.C. 2522. We find that the plaintiff has proved that the transmission defect existed when the automobile was sold to him. Finally, at the time of trial, the buyer had possession of the automobile and he stood ready to return the automobile to Paretti Pontiac.
Both lower courts seemed to reason that the plaintiff could not prevail because (1) the defects he proved were "minor" in that *116 they could be easily repaired[5] and (2) the plaintiff did not give Paretti Pontiac an opportunity to repair the automobile before he petitioned the trial court for redhibition.
The notion that easily repaired defects do not support redhibition is not found in our statutory law. C.C. 2520, et seq. Neither Domat nor Pothier mentioned "ease of repair" as being relevant to the determination of whether a defect will support redhibition. Domat wrote rather that a judge must "discern by the quality of the defects whether the sale ought to be dissolved."[6]
Thus, to prevail in an action for redhibition, a purchaser need not prove that the alleged defect is difficult to repair.[7] The purchaser need only prove a defect in the thing sold which "renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." C.C. 2520.
There is also no requirement in our statutory law that the purchaser allow his vendor an opportunity to repair the defective thing as a condition precedent to the successful maintenance of a suit for redhibition.[8] Evidently, this "opportunity to repair" requirement has been inferred from the many reported cases in which a purchaser of a new automobile has successfully sought redhibition after first giving the vendor several opportunities to repair the automobile. See, e. g., Media Pro. Consult., Inc. v. Mercedez-Benz of N.A., Inc., 262 La. 80, 262 So.2d 377 (1972); Reech v. Coco, 223 La. 346, 65 So.2d 790 (1953); Jackson v. Breard Motor Co., Inc., 167 La. 857, 120 So. 478 (1929); Crawford v. Abbott Automobile Co., Ltd., 157 La. 59, 101 So. 871 (1924).
This inference is erroneous. There is no requirement that a purchaser who seeks redhibition must first give his vendor the opportunity to repair the thing sold.
Defendant Paretti Pontiac contends that Prince waived the implied warranty against hidden defects when he signed the "Buyer's Order" document. On the back of this document was printed the following:
"Purchaser herein specifically waives the implied warranty provided for by Louisiana law, including all warranties against vices or defects or fitness for any particular purpose. This expressed waiver shall be considered a material and integral part of any sale which may hereinafter be entered into between the parties hereto."
A similar statement is contained in the "Pontiac New Vehicle Warranty and Owner Protection Plan" pamphlet which was given to the plaintiff following the consummation of the sale.
Warranty limitation provisions in "Buyer's Order" documents and automobile service manuals have no effect on the implied warranty against hidden defects. *117 Media Pro. Consult., Inc. v. Mercedez-Benz of N.A., Inc., supra.
Although the buyer may waive the implied warranty against hidden defects (C.C. 1764(2) and 2548), the waiver must be clear and unambiguous. C.C. 2474; Andry v. Foy, 6 Mart. (O.S.) 689 (1819). In this case, no waiver of the implied warranty against hidden defects is contained in the "Sale and Chattel Mortgage" document. There is also no evidence that any alleged waiver clause was either brought to the purchaser's attention or explained to him. Hence, we conclude that the plaintiff did not waive the implied warranty against hidden defects which ran in his favor.
Civil Code article 2531 provides that:
"The seller who knew not the vices of the thing, is only bound to restore the price, and to reimburse the expenses occasioned by the sale, as well as those incurred for the preservation of the thing, unless the fruits, which the purchaser has drawn from it, be sufficient to satisfy those expenses."
The price of the sale plus the costs of the sale (the finance charge on the unpaid price) totaled $4959.37.
Evidence adduced at trial tended to show that the plaintiff had driven the automobile approximately nine thousand miles prior to the trial of his suit for redhibition. There was also some evidence that the 1970 Pontiac had been involved in a minor accident which left the vehicle damaged.
However, the evidence of the damage is inadequate, and Paretti Pontiac does not seek reimbursement for either the purchaser's use of the defective automobile or any deterioration of the automobile.[9]
For these reasons, there will be judgment in favor of plaintiff, Donald L. Prince, and against Paretti Pontiac Company, Inc. in the amount of $4959.37, with all costs and legal interest from the date of demand, conditioned upon the return of Prince's 1970 Pontiac Lemans to Paretti Pontiac Company, Inc.
NOTES
[1] The "Purchase Order" is dated July 3, 1970. According to trial testimony, the sale was consummated July 2, 1970. However, the "Sale and Chattel Mortgage" document is dated June 30, 1970.
[2] The list was as follows:

1. Loud clanking noise in left front bumper. Sounds like shocks.
2. Large scratch on trunk.
3. Flow of heat coming from under rear seat while air conditioner is on. The heat is also outside the car.
4. Rubber on rim of trunk is out of line and makes the trunk hard to close.
5. Paint needs touch up on dash.
6. Flashers don't work.
7. Speedometer doesn't register right.
8. No light in ash tray or in glove compartment.
9. Air vent on right middle hard to open or close (A/C Vent).
10. Hub cap center section keeps falling off (left rear).
11. Idle needs adjustment. The car uses too much gas.
12. Rear parking light is out.
13. Radio has static. The speaker is vibrating heavily.
Prince also complained of no reverse gear, a flow of heat under the dash, leaks in the vinyl roof, the car starting with the ignition off, leaking transmission fluid, a leaking water pump, missing chrome, and various noises.
[3] This article does not differ materially from its sources: Civil Code of 1825, art. 2496; Digest of 1808, arts. 65 and 67; Code Napoleon (1804), art. 1641.
[4] This determination makes it unnecessary to consider whether other alleged defects in the automobile would support redhibition. Clearly, however, some of the defects listed in footnote 2 were apparent defects (C.C. 2521) which would not support redhibition. Some of the other listed defects would not support redhibition because the defects neither rendered the automobile absolutely useless nor rendered the use of the automobile so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it had he known of the defects. It is also unnecessary to determine whether redhibition could be supported by an accumulation of several defects which in themselves would not support redhibition.
[5] There is no evidence in the record that the transmission defect could have been repaired easily. Although there is some speculation in the record concerning the nature of the transmission defect, no inspection of the transmission system was ever undertaken.
[6] Domat, The Civil Law In Its Natural Order (as translated by Strahan), Part I, Book I, Title II, Sec. V, p. 238 (Cushing ed. 1861). See, also, Pothier, Treatise on the Contract of Sale (as translated by Cushing), Part II, Chapter I, Art. IV, p. 134 (1839).
[7] See, J. B. Beaird Co., Inc. v. Burris Bros., Ltd., 216 La. 655, 44 So.2d 693 (1949): Crawford v. Abbott Automobile Co., Ltd., 157 La. 59, 101 So. 871 (1924), In certain cases, "ease of repair" might be relevant to a judge's decision to decree merely a reduction in price, rather than redhibition. C.C. 2541 and 2543.
[8] See, Junius Hart Piano House v. Tauzin, 5 La.App. 495 (1927); Comment, 23 Tul.L.Rev. 97, 110 (1948).
[9] See, C.C. 2531; see, also, Comment, 30 La.L.Rev. 508 (1970) and the cases discussed therein.